UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

| | |
|---|---|
| United States of America,<br><br>　　　　　Plaintiff<br><br>　v.<br><br>William Alvear, M.D.,<br><br>　　　　　Defendant | Case No. 2:20-cr-00229-CDS-MDC<br><br>**Order Denying Defendant's Motion for Judgment of Acquittal and Motion for a New Trial**<br><br>[ECF Nos. 269, 271] |

　　　　On November 28, 2023, defendant William Alvear, M.D. was found guilty of three counts of Distribution of a Controlled Substance in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C), and five counts of Distribution or Dispensing of a Controlled Substance in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(2). *See* Verdict Form, ECF No. 261. On January 4, 2024, Alvear's counsel filed a motion for acquittal. ECF No. 269. The following day, counsel filed a motion for a new trial. ECF No. 271. The Government opposes both motions. ECF Nos. 273, 274. Avelar's counsel did not reply. For the reasons set forth herein, both of Alvear's motions are denied.

I.　　Background

　　　　This case stems from an undercover investigation between March and May of 2020. At the time, defendant Alvear was a licensed medical doctor in the State of Nevada. As a result of the investigation, Alvear was charged with eight violations of the Controlled Substances Act (CSA). Second Superseding Indictment, ECF No. 201.[1] Specifically, counts one through three charged Alvear with unlawfully prescribing a confidential human source (CHS) opioids, and counts four through eight charged Alvear with unlawfully dispensing Xanax pills. *Id.* A seven-day jury trial on the charges commenced on November 14, 2023. Mins., ECF No. 242. At the conclusion of the trial,

---

[1] Alvear was initially charged with eight violations of the CSA. Indictment, ECF No. 1. The government later superseded and added 35 additional charges. *See* Superseding Indictment, ECF No. 59. On October 25, 2023, the government superseded a second time. Second Superseding Indictment, ECF No. 201. In the second superseding indictment, Alvear was charged with eight violations of the CSA. *Id.* These are the charges that proceeded to trial in November of 2023.

the jury returned a verdict of guilty on all eight charges. Verdict Form, ECF No. 261. Sentencing is set for May 15, 2024. ECF No. 276.

II.     **Summary of the evidence introduced at trial.**

During the trial, the Government introduced undercover video evidence of Alvear's interactions with two CHSs[2] on three different days between March and May of 2020. *See* Govt.'s Exs. 1–6 (admitted 11/15/2023). The videos captured by the CHSs show Alvear meeting with the CHSs in his personal office (not in an examination room), during which time he prescribed CHS-2 opioids at the request of CHS-1 without taking any sort of medical form or conducting any sort of medical examination of CHS-2,[3] and he dispensed individual Xanax pills to both CHSs.[4] In the video of the CHSs' first visit to Alvear's medical office, CHS-1 told Alvear that CHS-2 needed pain pills due to a recent breast surgery, and CHS-1 offered to pay him a $200 "tip" instead of the $60 standard office visit fee. While Alvear asked some questions and made some comments about the dangers of opioid medication, he ultimately accepted the offer and wrote a prescription for an opioid for CHS-2. This video also showed Alvear removing individual pills from a bottle and placing them on a tissue or napkin at the front of his desk and the CHSs taking the tissues or napkins containing the Xanax pills. The subsequent videos were similar: Alvear took the CHSs' "tip" money in exchange for an opioid prescription and/or giving them Xanax pills, although he never conducted a medical examination of either CHS or reviewed their medical history. In the second video, CHS-2's reason for needing an opioid changed from recent breast surgery to "back pain." Still, Alvear did not conduct a medical examination nor review her medical history. Video evidence showed Alvear telling CHS-1 that if CHS-2 died from the prescription pills that he gave CHS-2, that it would be CHS-1's fault. The video evidence also captured Alvear pulling out cash,

---

[2] The two CHS are identified separately as CHS-1 (initials M.L) and CHS-2 (initial A.A.).
[3] This evidence related to the three counts of Distribution of a Controlled Substance in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C).
[4] This evidence related to the Distribution or Dispensing of a Controlled Substance in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(2) set forth in counts 4–8 of the second superseding indictment.

then approaching, hugging, and groping CHS-1's buttocks and looking down CHS-1's shirt.[5] He then propositioned CHS-1 for sex in exchange for money. While propositioning her, Alvear told CHS-1 that he "would wear a condom."

FBI Special Agent (SA) Courtney Brooks testified regarding the standard operating CHS procedures. In sum, the CHSs met with agents before each undercover visit. In these meetings, the FBI searched each CHS for contraband and equipped them with recording devices and cash to use for the visit. *See generally*, Trial Tr., Day 2 (TT2), ECF No. 279 at 58–66, 72–75, 80–84. At the conclusion of each undercover visit, the agents would retrieve the recording devices, the prescriptions for CHS-2, and the Xanax pills. *See generally id.* at 59–63, 73–78, 82–87. All pills given to the CHSs by Alvear were impounded and later submitted to a Drug Enforcement Agency (DEA) laboratory for testing. *See* Govt.'s Exs. 8–13 (impounded prescriptions and pills).

Both case agents[6] were extensively questioned by Alvear's trial counsel. *See generally* TT2, ECF No. 279 at 95–152. The case agents were questioned, and at times impeached, about their recollections regarding this investigation, what sort of documents they obtained and/or reviewed during this investigation, what was seized from Alvear's clinic during a search warrant related to the investigation, if they were aware that CHS-1 had a preexisting relationship with Alvear, their knowledge of text exchanges between CHS-1 and Alvear during the spring of 2020, and whether Alvear was a licensed medical doctor during the relevant time period, amongst other subjects.

DEA Senior Forensic Chemist Alexandra Ambriz testified as an expert in forensic chemistry. Trial Tr., Day 3 (TT3), ECF No. 280 at 159. Ambriz testified about the process she used to test the Xanax pills that were impounded during the investigation in this case. *See generally id.* at 160–66 (identifying Govt.'s Exs. 9-D, 11-C, and 13-C, identified on 11/15/23, admitted on 11/16/23). She opined that each pill contained alprazolam,[7] which is a controlled substance. TT3, ECF No. 280 at 164. Ambriz was cross-examined by Alvear's counsel. *See generally id.* at 166–67.

---

[5] CHS-1 also provided testimony regarding what happened during this interaction. *See* Trial Tr., Day 4 (TT4), ECF No. 281 at 39–40.
[6] *See infra*, pg. 7.
[7] Alprazolam is more commonly known as Xanax.

3

Dr. Timothy Munzing also testified during the trial as an expert witness in family medicine, pain management, and the legitimate and lawful prescribing and dispensing of controlled substances. *See generally* TT2, ECF No. 279 at 163–71; TT3, ECF No. 280 at 5–141. Dr. Munzing opined about the standard of care in prescribing opioids in Nevada and elsewhere, including physically evaluating a patient in order to diagnose them, collecting a comprehensive medical (including prescription) history and records, conducting laboratory testing, creating treatment plans, and more. *See generally*, TT3, ECF No. 280 at 8–31. He also testified about appropriate doctor/patient relationships, and how Alvear's meetings and relationships with both CHSs were "red flags"—including Alvear's acceptance of cash "tips" and not conducting any sort of physical examination. *Id.* at 28–47. Munzing walked through all three undercover videos and testified regarding red flags and other concerns about what was recorded. *Id.* at 47–55. Munzing testified that each interaction with the CHSs was "far below the floor" of the standard of care doctors should provide to their patients. *Id.* at 55. He further testified on re-direct that the prescriptions Alvear wrote for CHS-2 were not medically legitimate. *Id.* at 140. Munzing was extensively cross-examined. *Id.* at 56–138.[8]

The Government introduced testimony from two witnesses[9] who testified that during the time period alleged in the indictment, Alvear was not licensed to dispense medication. TT2, ECF No. 279 at 54–55. The Government also introduced a letter from the Nevada Board of Pharmacy showing that Alvear was not licensed to dispense medication during the relevant time-period. *See* Letter from the Nevada Board of Pharmacy, Govt.'s Ex. 23.

CHS-1 testified during the trial. Trial Tr., Day 4, ECF No. 281 at 19–82. CHS-1 testified that she was an opioid addict when she first became Alvear's patient in 2016. *Id.* at 22–23. CHS-1

---

[8] Alvear's counsel questioned Munzing about the fact that he never practiced medicine in Nevada; the fact that he has only testified as an expert for the government and has received millions of dollars in fees; about his testimony in other cases and if he had a prior working relationship with the case agents and whether he noted in a biography that it was his "secret goal" to lecture at the FBI Academy; the completeness and accuracy of his report for this case; and more. *Id.*

[9] The first witness was one of the co-case agents, FBI Special Agent Courtney Brooks. The second witness was Leo Basch. *See infra*, pg. 6.

testified that she went to Alvear to obtain "pain pills" and paid Alvear in cash for the pain pills. *Id.* at 23. CHS-1 further testified that Alvear charged $60 for an office visit, but she usually paid between $100 and $150 per visit. *Id.* She also testified that she texted Alvear throughout their relationship, up until 2020 when he ceased being her doctor. *Id.* at 25. CHS-1 explained what she did as a CHS for this investigation and what was going on during each of the undercover videos. *See generally id.* at 33–51.

Under cross-examination by Alvear's counsel, CHS-1 testified that she became a CHS for the FBI in 2018. *Id.* at 58. She further testified that Alvear became her doctor in 2016, initially seeing him to get pain pills to feed her addiction, but that at some point Alvear helped her "get clean[.]" *Id.* at 58–65. She also testified that she had a "friendly" relationship with Alvear, and that they would text each other, even prior to her working as a CHS. *Id.* at 64–65. CHS-1 testified that she suggested that Alvear give CHS-2 oxycodone, and Alvear gave her Xanax during the CHSs first meeting in Alvear's office. *Id.* at 67–68. She further testified that she got paid to work as a CHS in this case,[10] and that the FBI helped her with her immigration status. *Id.* at 70–72. CHS-1 was impeached about providing different dates of birth to Alvear and the FBI. *Id.* at 75–78.

Leo Basch, a pharmacist and employee of the Nevada State Board of Pharmacy, testified during the trial as an expert "in the distributing and dispensing of controlled substances and for the identification and use of controlled substances." *See id.* at 84–108; 117–137. Basch testified about Nevada's Prescription Monitoring Program (PMP), explaining that doctors, pharmacies, and pharmacists have access to the PMP database. *Id.* at 96–98. He further testified that the purpose behind the database is to "help practitioners and also pharmacies know if a patient has [ ] gotten a controlled substance from another practitioner or another pharmacy and help prevent overuse and – of opioids and other controlled substances, even benzodiazepines." *Id.* at 99. He also testified that practitioners are required to check the PMP database prior to issuing a patient a prescription for a controlled substance, and noted that in reviewing the undercover videos, it did

---

[10] Counsel asked if she was paid $3,000 for her work as a CHS, but she responded she could not recall how much she was paid. TT4, ECF No. 281 at 70.

not appear that Alvear checked the CHSs' PMP records before writing them opioid prescriptions. *Id.* at 124. Basch also testified that a "dispensing practitioner license" is required to dispense medication. *Id.* at 100. To be a dispensing practitioner, a doctor must apply for a license and renew it every two years. *Id.* at 100–01. He further testified about the requirements for dispensing and storing the medication, as well as labeling and documenting what is dispensed. *Id.* at 103–04. He testified that Alvear's license to dispense medication expired on October 21, 2018, and was not active in 2020—the time he was dispensing benzodiazepine pills to the CHSs. *Id.* at 106; *see also* Letter from Nevada Board of Pharmacy, admitted 11/15/2023, Govt.'s Ex. 23. Basch further testified about the "red flags" he saw in reviewing the undercover videos in this case and opined that the Xanax pills were improperly given out (noting that it would even qualify as being dispensed), and were not provided for a legitimate medical purpose. *Id.* at 121–22.

Basch was also cross-examined during the trial. *Id.* at 131–37. Alvear's counsel questioned Basch about (1) the PMP database and timeline of its creation/existence, (2) whether one purpose behind the PMP was preventing "doctor shopping," (3) overdose risk scores, and more. *Id.* At the conclusion of Basch's testimony, the Government rested its case-in-chief. *Id.* at 138. Thereafter, Alvear moved for a Federal Rule of Criminal Procedure 29(a) motion, which was denied. *Id.* at 139–141.

Alvear elected to present a defense case. First, Alvear called Leticia Cardenas, a woman who worked in Alvear's office performing administrative duties between 2009 and July of 2018. Trial Tr., Day 6 (TT6), ECF No. 284 at 40–41. Cardenas testified that one of her roles was maintaining and retrieving medical records. *Id.* at 41–42. She testified that she was a records custodian for the office's medical records and explained how records were created and then stored. *Id.* at 42–45. She further testified that she was responsible for giving intake forms to patients. *Id.* at 45. Through Cardenas, the defense moved in CHS-1's intake sheet from 2016, where she reported coming in to see Alvear for a UTI,[11] and other medical records. ECF No. 46–47; *see*

---

[11] "UTI" stands for Urinary Tract Infection.

*also* Def.'s Exs. 511–516 (admitted 11/27/23). Cardenas was asked about what year CHS-1 listed as her year of birth on her intake form. *Id.* at 48–49. She also testified that while working for Alvear, part of her job was to run the PMP on patients, and that at the time CHS-1 came in to see Alvear in 2016, she ran her PMP database but got no result. *Id.* at 55–56. The Government cross-examined Cardenas. *Id.* at 58–61. During cross-examination, Cardenas testified that CHS-1 paid $60 for her first office visit with Alvear in 2016. *Id.* at 60.

Alvear then called FBI Special Agent Zach Carey, who was the co-case agent, to testify. TT6, ECF No. 284 at 62–171. SA Carey testified about meetings with the U.S. Attorney's Office and preparing witnesses for trial. *Id.* at 62–77. He was questioned about what he could and could not recall about information included in an FBI 302[12] about CHS-1's pretrial interview. *Id.* He was further questioned about the items seized during a search warrant at Alvear's office and what he could remember about those items (including pill bottles from within Alvear's personal office). *Id.* at 78–85. During his testimony, SA Carey discussed assisting CHS-1 with her immigration status (*id* at 86, 96–97) and certain documentation regarding that assistance. *Id.* at 88–92, 95–97, 105–06, 136–37. SA Carey was also questioned about maintenance of CHS-1's file. *Id.* at 93–97. He further testified about guidelines and policies associated with how to handle CHSs, the vetting of CHSs, what may or may not qualify someone to work as a CHS, and what happened when the FBI learned CHS-1 had violated certain provisions of her CHS agreement. *Id.* at 100–03, 128–36. SA Carey was questioned about monitoring CHS-1 and her activities, as well as questions about CHS-1's source agreement, including the provision that discusses "otherwise illegal activity." *Id.* at 113–17, 140–41. SA Carey was also questioned about whether he was aware that CHS-1 was going to see Alvear without the FBI's authorization, and about paying CHS-1 for her work on this case. *Id.* at 118–126, 137–38. And SA Carey was asked whether he was "signalling" to CHS-1 during her testimony, to which he explained that he was reacting to what he believed was a

---

[12] "After FBI agents conduct a formal interview, they incorporate their handwritten notes into a more complete report of the interview on the FBI's Interview Report Form FD-302, known colloquially as a '302.'" *United States v. Lloyd*, 807 F.3d 1128, 1159 (9th Cir. 2015) (internal quotation marks, citation, and alterations omitted).

misrepresentation of the facts in a question posed to CHS-1 during her cross-examination, and that he had no intent to signal. *Id.* at 142–43.

During cross-examination, SA Carey testified about why the agency utilized CHSs instead of undercover agents for this investigation (*id.* at 149–50), what he did prior to and after sending the CHSs to Alvear's office, and his review of the recordings captured by the CHSs. *See generally id.* at 151–70.

Alvear also called CHS-1 in his case-in-chief. *Id.* at 172–99. During her testimony, CHS-1 testified what was going on during certain snippets of the undercover recordings. *Id.* at 173–75. She was questioned about whether she saw other doctors between March and September of 2020, and whether her memory was impacted by certain medication she was taking during the investigation into Alvear. *Id.* at 176–81. She was again questioned about her immigration status and about her struggle with addiction. *Id.* at 182. CHS-1 also testified about meeting the prosecutors for pretrial preparation (*id.* at 183–85) and whether she had a driver's license before working with the FBI as a CHS. *Id.* at 187.

The Government cross-examined CHS-1, asking about paying Alvear "cash tips" in exchange for opioids and what occurred during her visits with Alvear. *Id.* at 190–91. She also testified about what she was told during pretrial meetings with the prosecutors. *Id.* at 191.

CHS-1 was redirected by Alvear's counsel. During redirect, CHS-1 testified that she did not tell anyone at Alvear's office about her opioid addiction when she first began seeing him as a patient (*id.* at 198) and answered some additional questions about what occurred during some of her visits to Alvear's office. *See generally id.* at 193–97.

The last witness called by Alvear was former detective Timothy Beck. *Id.* at 199–251; Trial Tr. Day 7 (TT7) ECF No. 285 at 20–24. Beck testified about his law enforcement career, including his involvement in undercover investigations into medical practitioners, his experience handling and vetting CHSs, the challenges of utilizing CHSs who have a history of substance use disorders, entrapment, and the particular concerns of utilizing CHS-1 because of her prior

relationship with the target of an investigation, in this case, Alvear. *See generally* TT6 at 199–227. During his testimony, he was qualified to testify as an expert regarding the use of confidential human sources or informants and regarding undercover narcotics investigations. *Id.* at 228. Beck testified about his review of the evidence in this case and critiqued the FBI's handling of CHS-1 and the investigation. *Id.* at 229–39; 241–47. Beck stated that there is a risk of a target being "highly susceptible" to the influence of a CHS if they have a prior relationship (*id.* at 240) and testified that he would not have utilized CHS-1, especially after watching the video of CHS-1 and Alvear interacting in the first undercover video. *Id.* at 245–46. He also opined that it was not a good idea to utilize two CHSs at the same time. *Id.* at 246–47.

The Government cross-examined Beck. *Id.* at 248–54. During cross, Beck discussed that he had never used a CHS or an informant in any of the four cases about which he specifically testified during direct examination. *Id.* at 248–49. He was questioned about whether he was an FBI agent or if he had ever worked on an FBI Task Force, to which he responded no. *Id.* at 249–50. Beck was questioned about what he reviewed in preparation for his report and his testimony.[13] *Id.* at 251. Beck was also questioned about why he left a DEA Task Force he was previously assigned. *Id.* at 250.

Prior to the defense resting its case, Alvear was canvassed about whether he was going to testify at trial. TT6, ECF No. 284 at 271–73. Based on the advice of counsel, Alvear did not testify. *Id.* at 273. The defense rested its case on day seven of the trial. TT7, ECF No. 285 at 32.

The Government presented a rebuttal case. They called FBI language specialist Alfredo Brunet-Vera, who testified about translating certain text messages recovered from Alvear's cellphone. *See generally* TT7, ECF No. 285 at 33–37. Brunet-Vera was not cross-examined. The Government then recalled SA Brooks, who also testified about text messages seemingly

---

[13] There was a dispute regarding what had been reviewed and disclosed regarding Beck's testimony. This required the court to take an overnight break to resolve the dispute. *See id.* at 252–54; 256–70; TT7, ECF No. 285 at 6–13.

discussing Alvear providing prescription medication to other persons that were recovered from Alvear's cellphone. *Id.* at 44–50. SA Brooks was cross-examined. *Id.* at 48–50.

The Government then rested its case and jury instructions were finalized. One instruction provided to the jury was the entrapment instruction.[14] It read as follows:

> The defendant contends that he was entrapped by a Government agent. The Government has the burden of proving beyond a reasonable doubt that the defendant was not entrapped. The Government must prove either:
> 1. The defendant was predisposed to commit the crime before being contacted by Government agents; or
> 2. The defendant was not induced by the Government agents to commit the crime.
> When a person, independent of and before Government contact, is predisposed to commit the crime, it is not entrapment if the Government agents merely provide an opportunity to commit the crime.
> In determining whether the defendant was predisposed to commit the crime before being approached by Government agents, you may consider the following:
> First, whether the defendant demonstrated a reluctance to commit the crime;
> Second, the defendant's character and reputation;
> Third, whether the Government's agents initially suggested the criminal activity;
> Fourth, the nature of the Government's inducement or persuasion.
> In determining whether the defendant was induced by Government agents to commit the offense, you may consider any Government conduct creating a substantial risk that an otherwise innocent person would commit an offense including persuasion, fraudulent misrepresentations, threats, coercion tactics, harassment, promises of reward or pleas based on need, sympathy, or friendship.
> It is not entrapment if a person is tempted into committing a crime solely on the hope of obtaining ill-gotten gain. That is often the motive to commit a crime. However, in deciding whether a law enforcement agent induced the defendant to commit the crime, the jury may consider all of the factors that shed light on how the agent supposedly persuaded or pressured the defendant to commit the crime.

TT7, ECF No. 285 at 94–95; *see also* Jury Instructions, ECF No. 224 at 30–31.

After receiving all the instructions and hearing closing arguments from the parties, the jury was released to deliberate the case. Approximately three hours later, the jury returned a verdict of guilty on all counts. TT7, ECF No. 285 at 150–55; *see also* Verdict Form, ECF No. 261.

---

[14] The defense advised the government and the court it would be arguing entrapment in pre-trial filings (*see* Notice of Expert Testimony, ECF No. 99) and at calendar call (*see generally* Transcript from calendar call, ECF No. 237). The defense also requested an entrapment instruction be given. Joint Proposed Jury Instructions, ECF No. 224 at 30–31.

III.     Legal Standard

     A.     Motion for judgment of acquittal

Federal Rule of Criminal Procedure 29 provides that "the court may set aside the verdict and enter an acquittal." Fed. R. Crim. P. 29(c). When evaluating a motion for judgment of acquittal the court "review[s] the evidence presented against the defendant in the light most favorable to the government to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Hernandez-Herrera*, 273 F.3d 1213, 1216 (9th Cir. 2001) (internal quotation marks and citation omitted). "[I]t is not the district court's function to determine witness credibility when ruling on a Rule 29 motion" (*United States v. Alarcon–Simi*, 300 F.3d 1172, 1176 (9th Cir. 2002)), that is within the exclusive function of the jury. *United States v. Rojas*, 554 F.2d 938, 943 (9th Cir. 1977). Rather, "after viewing the evidence in the light most favorable to the government," the relevant question is whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Cordova Barajas*, 360 F.3d 1037, 1040 (9th Cir. 2004) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). If a rational trier of fact could find the essential elements of the crime(s) beyond a reasonable doubt, then motion must be denied. *United States v. Nevils*, 598 F.3d 1158, 1164 (9th Cir. 2010) (en banc).

Further, a Rule 29 motion for a new trial is "directed to the discretion of the district judge and should be granted only in exceptional cases in which the evidence preponderates heavily against the verdict." *U.S.A. v. Perez*, 2019 WL 4573488, at *2 (C.D. Cal. Sept. 19, 2019) (citing *Pimentel*, 654 F.2d at 545) (internal quotation marks removed).

     B.     Motion for a new trial

Federal Rule of Criminal Procedure 33 permits a district court to vacate any judgment and grant a new trial if the interest of justice so requires. Fed. R. Crim. P. 33(a). "A district court's power to grant a motion for a new trial is much broader than its power to grant a motion for judgment of acquittal," and the court may thus weigh the evidence itself and judge the credibility

of witnesses. *United States v. A. Lanoy Alston, D.M.D., P.C.*, 974 F.2d 1206, 1211 (9th Cir. 1992). However, Rule 33 motions are generally disfavored and should only be granted in "exceptional" cases. *United States v. Del Toro-Barboza*, 673 F.3d 1136, 1153 (9th Cir. 2012) (citing *United States v. Pimentel*, 654 F.2d 538, 545 (9th Cir. 1981)). The heavy burden of proving a new trial is warranted rests with the defendant. *See United States v. Halali*, 2017 WL 3232566, at *2 (N.D. Cal. July 28, 2017) (quoting *United States v. McCourty*, 562 F.3d 458, 475 (2d Cir. 2009)).

III.     Discussion

Before deciding Alvear's motions on the merits, the court must address a concern. Both of Alvear's motions were filed by his new counsel—not his trial counsel[15]—without first obtaining a copy of the transcript. The transcripts (which remain under seal) were not released until January 29, 2024. *See* ECF Nos. 277–87. Both motions require consideration of the evidence and references to the evidence as an important component of the motions. While not a basis to deny either motion, the court addresses this issue as a reminder of counsel's need to fully comply with Local Rule 7-2(a) which mandates that "[a]ll motions—unless made during a hearing or trial—must be… supported by a memorandum of points and authorities." Without the benefit of the transcript, Alvear's motions are certainly lacking key points.

Turning to the merits of the motion for judgment of acquittal, Alvear's argument that there was no evidence that he "knowingly or intentionally prescribed controlled substances without evidence of medical necessity (or outside of the normal course of the doctor's practice)" is unconvincing. ECF No. 269 at 3. As established by the video evidence and the testimony of CHS-1, Alvear prescribed opioids in his personal office, in the presence of both CHSs, without conducting any sort of medical examination, obtaining past medical records, verifying the CHSs' purported medical ailments, or checking the PMP database, amongst other issues. Stated otherwise—he prescribed medication without evidence of medical necessity. Thus, in considering the trial evidence in the light most favorable to the Government, the record clearly establishes

---

[15] *See* Order granting motion to substitute counsel, ECF No. 266.

that any rational trier of fact could have found beyond a reasonable doubt that Alvear violated 21 U.S.C. § 841(a)(1) and (b)(1)(C) as alleged in counts 1–3 of the second superseding indictment. *See* Second Superseding Indictment, ECF No. 201 at 4.

Further, the Government introduced evidence that Alvear was not licensed to dispense medication during the relevant time period. There was no evidence to the contrary introduced. Consequently, in considering the lack of proper licensing together with the video evidence showing Alvear dispensing individual Xanax pills to the CHSs in the light most favorable to the Government, the record clearly establishes any rational trier of fact could have found beyond a reasonable doubt that Alvear violated 21 U.S.C. § 841(a)(1) and (b)(2) as set forth counts 4–6 of the second superseding indictment. *Id.* at 5.

Alvear's argument that the government failed to demonstrate that he was not entrapped is belied by the verdict itself. "[W]hether a defendant was entrapped is a question for the jury." *United States v. Jones*, 231 F.3d 508, 516 (9th Cir. 2000). To succeed on an entrapment defense as a matter of law defense, the defendant must persuade the court that "viewing the evidence in the light most favorable to the government, no reasonable jury could have found in favor of the government as to inducement or lack of predisposition." *United States v. Poehlman*, 217 F.3d 692, 698 (9th Cir. 2000). Alvear fails to meet this burden. At trial, Alvear's counsel argued entrapment in opening and closing statements. During both direct and cross-examinations of witnesses, Alvear's counsel presented evidence about text conversations, meetings, and alleged romantic interests between CHS-1 and Alvear. The parties disputed the relevance and that evidence, and argued their respective positions on whether or not it showed that Alvear was entrapped. Further, in the Government's rebuttal case, they provided evidence of Alvear's seeming predisposition to provide controlled substances to individuals who were not his patient, and seemingly without any sort of medical examination. The jury was provided the entrapment instruction, together with other jury instructions, and was therefore able to consider and weigh the various factual disputes and entrapment defense in reaching its verdict. That alone establishes Alvear was not entrapped as a

matter of law. The verdict also demonstrates that the jury rejected the argument that Alvear was not predisposed to commit the acts alleged in the second superseding indictment or it found that the Government did not induce him. The jury's verdict supports that finding that Alvear was not entrapped. Consequently, Alvear's motion for judgment of acquittal fails and I do not find this to be an exceptional case where the evidence preponderates heavily against the verdict. Rather, the evidence heavily supports the verdict.

Alvear's motion for a new trial fails for much of the same reasoning. In weighing the evidence (in particular, the video evidence) and the credibility of the witnesses (some of which is bolstered by the video evidence), I do not find that the interests of justice entitle Alvear to a new trial. The video evidence clearly shows Alvear's violations of the Title 21 offenses set forth in the second superseding indictment. The witness testimony and other evidence only aggravates what is depicted in the videos. Accordingly, Alvear fails to meet his burden demonstrating a new trial is warranted, much less that his case falls into the "exceptional" category under Rule 33. Thus, his motion for a new trial is denied.

## IV.     Conclusion

IT IS THEREFORE ORDERED that Alvear's motion for a judgment of acquittal **[ECF No. 269] is denied**.

IT IS FURTHER ORDERED that Alvear's motion for a new trial **[ECF No. 271] is denied**.

Dated: March 1, 2024

_____
Cristina D. Silva
United States District Judge